**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**MARILYN Y. LEWIS,**

  **Plaintiff,**

**vs.**          **Case No. 4:08cv441-RH/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

  **Defendant.**

_____/


## REPORT AND RECOMMENDATION

  This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the

decision of the Commissioner be reversed and remanded for further consideration.

**Procedural status of the case**

  Plaintiff, Marilyn Y. Lewis, applied for disability insurance benefits alleging onset

of disability on March 25, 2002.  Plaintiff was 54 years old at the time of the last

administrative decision,[1] has a 12th grade education, and has past relevant work as a school bus driver, paratransit scheduler, and mental health outreach coordinator. Plaintiff alleges disability due to fibromyalgia, affective disorders, and pain. The Administrative Law Judge found that Plaintiff's last date for insured disability insurance benefits was December 31, 2003. R. 732-733.

The ALJ determined that Plaintiff has the severe impairments of fibromyalgia, headaches with episodes of syncope, and degenerative disc disease. R. 734. He determined that depressive disorder and panic disorder were not severe impairments, and found that Plaintiff has the residual functional capacity to do light work. R. 739. Finally, he determined that Plaintiff can do her past relevant work as a motor vehicle dispatcher, house manager, and telephone operator, and is not disabled. R. 742.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

---

[1] This decision was rendered after this court, on the consented motion of the Commissioner, remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for rehearing. R. 749-750, case no. 4:06cv291-MP/WCS.

2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

The hearing on remand was held on November 27, 2007.  R. 1145.  Plaintiff was

54 years old at the time of the hearing.  R. 1149.  She had started working again in July,

2006, but stopped in March, 2007, because she had periods of weakness.  R. 1149-

1150.  She said that she had "just dropped someone off and I went to get back on the bus and my whole body just went numb," and the ambulance was called.  R. 1150.  She said that her neurologist told her not to go back to work.  *Id.*

She said that this was an episode of the same condition she had had for years. *Id.*  She said that her body becomes "completely weak," and she has no strength.  *Id.* She cannot even lift her head.  *Id.*  The weakness is most noticeable in her legs.  *Id.* She said that it takes two to three hours for her upper body strength to start coming back, and strength may not return to her legs until the next day, or two or three days later.  R. 1151.  She said that she suffers two to three such sudden weakness episodes per month.  *Id.*  She had been told that these episodes were her body's reaction to her anxiety and depression.  *Id.*  Sometimes pain is associated with this onset of weakness. R. 1152.  Her speech is slurred during an episode.  *Id.*

Plaintiff said that she first had an experience like this on April 16, 1996.  R. 1153. She was walking across the floor, "just dropped to the floor," and could not get up.  *Id.*

Plaintiff said she has pain in her lower spine, hips, and legs, and the pain disturbs her sleep.  R. 1154.  Plaintiff said that she had been seen by a physician several times a month for eleven years, since 1996.  R. 1156.  She had attended physical therapy several times, but it always made her condition worse.  R. 1157.  She had taken medications when she had the money for medications.  *Id.*  She paid for her own medications when she was working, but now that she is not working, her husband was reluctant to pay for her medications.  *Id.*  She said she had tried Tai Chi, water aerobics, walking short distances, and "everything results in more frequent episodes." R. 1157-1158.

**Medical evidence**[2]

### Physical health evidence

On May 15, 1996, Plaintiff was referred to Michael R. Sorrell, M.D., a neurologist, because she had experienced "episodic generalized weakness."  R. 820.  Plaintiff said that he had had six episodes of having her legs give way, and of being unable to stand back up.  *Id*.  She said that: "When symptoms of profound weakness start she develops tingling throughout her entire body and she finds that her head and shoulders droop." *Id*.  An MRI on May 8, 1996, of Plaintiff's brain revealed non-specific foci of increased T2 signals in the white matter of both cerebral hemispheres consistent with demyelination (such as multiple sclerosis) or consistent with hypertension.  R. 820, 823.  Her neurological examination was "essentially within normal limits," but Dr. Sorrell also found:

> Ninety seconds of hyperventilation reproduced an episode of profound weakness and body numbness.  She also developed mild tremulousness of each hand.  Despite my urging, she could not slow her breathing to less than 28 times per minute. . . .

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

R. 821. Dr. Sorrell prescribed Ativan.[3] *Id.* He thought that "the relaxation and the medication may go a long way to improving her well being." *Id.*

A cervical MRI on April 29, 1995, revealed bilateral cervical neural foramen narrowing related to Luschka joint hypertrophy. R. 824. An MRI of the cervical spine on June 5, 1996, revealed a minimal central disc protrusion at C3-C4, without significantly affecting the nerve roots, and a minimal central disc protrusion at C4-C5. R. 816.

Plaintiff was seen at Shands Clinic on June 15, 1998, by Melvin Greer, M.D., Chairman of the Department of Neurology. R. 1136. Although she had many complaints, Dr. Greer said: "I cannot account for her problem as being in some way attributable to any ongoing organ disease process. EEG today was normal. Impression, no evidence of any disease." R. 1137. He encouraged Plaintiff to be active and mobile. R. 1138.

On April 14, 1999, Plaintiff was seen by John M. Szczesny, M.D. R. 268. After a difficult examination by Nurse Karen Lairsey-McCants, during which Plaintiff twice went into a trance without falling and lashed out when the nurse tried to palpate her lumbar spine, a diagnosis of probable fibromyalgia was entered coupled with the observation that Plaintiff had "body tenderness *in excess of* the trigger points generally related to fibromyalgia." R. 268. Mellaril was prescribed. R. 269 (emphasis added).

On April 28, 1999, against went to Dr. Szczesny. R. 265. She was much better after taking Mellaril for fourteen days. *Id.* On examination, Plaintiff had tender points,

---

[3] Ativan is used in the treatment of anxiety disorders and for short-term (up to 4 months) relief of the symptoms of anxiety. It belongs to a class of drugs known as benzodiazepines. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

but not the overall body tenderness that she had exhibited on the last visit. *Id*. She walked without difficulty, and her gait was steady and full speed. *Id*. She did not exhibit any blinking eye motions, no opening and closing of her mouth, as she did on the last visit. *Id*. The diagnosis was fibromyalgia, much improved on Mellaril, questionable neurologic problems, chronic headaches, and chronic pain and muscle spasms, much improved with Mellaril. R. 266.

On May 5, 1999, she was seen by Dr. Greer, M.D. R. 1122-1123. Plaintiff complained of a variety of disparate problems. R. 1122. She said she experienced severe pain on the left side of her head. *Id*. She said she had intermittent leg weakness, pain, and numbness, causing her to fall and lasting for hours, and her legs sometimes rose from the floor involuntarily. *Id*. She said she experienced unrelated weakness and numbness in her hands and arms, and occasional painful spasms in the upper body. *Id*. She had difficulties in concentrating. *Id*. Although she demonstrated the rocking motion, her walking with encouragement was normal. R. 1123. Dr. Greer thought that neurovelocity conduction testing should be undertaken "just to assure us that we are not dealing with some type of chronic neuropathic disturbance for which anything further needs to be done. Otherwise, my impression would be by and large what it had been previously." *Id*.

Plaintiff continued to be feeling much better, with much less pain, on June 15, 1999, when she was again seen by Dr. Szczesny. R. 262. She continued to have weakness of her legs. *Id*. She was sleeping better, and was not fatigued during the day. *Id*.

On August 9, 1999, Plaintiff returned to Dr. Szczesny. R. 259. She had had a psychiatric referral and had been taken off Mellaril due to side effects. *Id.* She continued to complain of falling down. *Id.* It was noted that Plaintiff had had "numerous evaluations and referrals related to her complaints. All have been negative." *Id.*

On August 15, 1999, Plaintiff was seen by Charles G. Maitland, M.D., at the Neuro-Ophthalmology & Balance Disorders Clinic. R. 218. Dr. Maitland reported to Dr. Ricardo Ayala that after review of her second MRI, he observed "several subcortical lesions" which were "clearly white matter and without question not normal." *Id.* He noted her history of fibromyalgia. R. 219. Dr. Maitland's clinical examination reported normal findings. *Id.* After finding potential eye problems, he thought that Plaintiff had a "very subtle optic neuropathy which would give her a multifocal process." *Id.* He also wondered whether "the events she is describing do not represent paroxysmal ataxia (and maybe even paroxysmal dyskinesias) in a setting of an underlying demyelinating process." *Id.* He said that the MRI scan results were "nonspecific." *Id.*

On September 7, 1999, physical therapy was recommended. R. 258. On October 20, 1999, Plaintiff said she had been doing well with physical therapy and had not fallen since starting. R. 256. She had not felt well, however, since Mellaril had been discontinued. *Id.* It was noted that "[w]hen she was seen by Dr. Platt, he felt that she did not need to be on Mellaril as she did not have any psychiatric problems . . . ." *Id.* On examination, she walked with a normal gait but had uncontrolled muscle spasms when asked to heel walk and toe walk, had difficulty maintaining balance, and had soft tissue tenderness not only in the pattern typical for fibromyalgia. *Id.*

On December 9, 1999, Dr. Szczesny reported that Plaintiff had had a normal MRI of her brain.  R. 252.  Mellaril was again prescribed.  *Id.*

Another MRI of Plaintiff's brain was taken on June 29, 2001.  R. 322.  "[F]ocal regions of hyperintense T2 signal abnormality in the supratentorial white matter" was observed.  *Id.*  The findings had "become more pronounced since the prior study."  R. 323.  Also, on "the axial T2-weighted FSE images, there is an apparent region of signal abnormality within the brainstem at the cervicomedullary junction."  *Id.*  The findings were deemed "nonspecific," and could correlate to a history of diabetes or hypertension reflecting "advanced chronic small vessel ischemic change."  *Id.*  Clinical correlation "to exclude the possibility of demyelinating disease" was recommended.  *Id.*

On August 22, 2001, Dr. Maitland said that he had the opportunity to examine Plaintiff "during a spell."  R. 217.  He observed that she had "two or three beats of nystagmus in left gaze, but a rather more obvious torsional beating nystagmus[4] to the right in the right gaze that appears sustained."  *Id.*  He said: "The inability to walk, however, is associated with flagrant astasia-abasia.[5]"  *Id.*  He said that her "power seems normal," but "[a]s soon as I stood her up she went into a flailing movement across her hips[,] then just suddenly collapsed."  *Id.*  He said he had no way of knowing

---

[4] Nystagmus is the involuntary, rapid, rhythmic movement of the eyeball; it may be horizontal, vertical, rotatory, or a mixture of two types.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[5] Astasia-abasia is a lack of motor coordination with an inability to stand or walk despite normal ability to move the legs when sitting or lying down, a form of hysterical ataxia.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

if this had an organic basis.  *Id.*  He thought there might be some sort of "paradoxical

discharging here in the vestibulocerebellar system that trips this off . . . ."  *Id.*

Plaintiff was examined by Dr. Maitland, M.D., on March 18, 2002.  R. 212.  He

reported to Dr. Ayala that he had seen Plaintiff twice in the previous fall, and he

"actually witnessed one of the spells . . . ."  *Id.*  He said that she "had obvious torsional

nystagmus beating to the right that was present only in right gaze and appeared

sustained."  *Id.*  He said that she "complained of ataxia[6] at that time, but unfortunately

had gait disorder at the time that suggested astasia abasia."  *Id.*  He said that it had

heard that Plaintiff had been started on Avonex for demyelinating disease.  *Id.*  On

clinical examination, Plaintiff had normal gait and station.  *Id.*  There was no

spontaneous nystagmus.  *Id.*  Dr. Maitland reported that he did not have a better

explanation for Plaintiff's complex of symptoms than he did "last year."  R. 213.  He

said:

> [T]here is no question that when we saw her during an attack, she had
> nystagmus that was unidirectional and torsional.  It looked all the world
> like vestibular disturbance obeying Alexander's Law.  That said, the gait
> disturbance that accompanied it was floridly astasia abasia.  Again I can
> only speculate that maybe she has a condition akin to paroxysmal [sudden
> onset] ataxia.

*Id.*

On October 2, 2002, Plaintiff had an MRI of her lumbar spine.  R. 291.  This

revealed mild broad based disc bulging at L2-L3, L3-L4, and L4-L5.  *Id.*

---

[6] Ataxia is a failure of muscular coordination; irregularity of muscular action.
DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Plaintiff attempted physical therapy commencing on March 13, 2003. R. 554. On April 1, 2003, she fell, exacerbating her chronic lumbar and pelvic pain. R. 283. She was found to be without palpable muscle spasm, but sore. *Id.* She was seen by Dr. R. Forman on April 2, 2003, who noted that she had a "very extensive history of falls." R. 285. He noted rapid movement response on pain stimulation. *Id.* His diagnosis was "trochanteric bursitis, purformis spasm, and iliocostalis muscle spasm accounting for back and hip pain." R. 286. He injected her bursa with anesthetics. *Id.* Plaintiff was discharged from physical therapy on April 14, 2003, due to pain. R. 551.

Plaintiff returned to Dr. Maitland again on April 15, 2003. R. 206. Dr. Maitland was at a loss as to how to treat Plaintiff. *Id.* His said that his clinical examination revealed that she walked with a narrow base, with one foot in front of the other, and sometimes "elaborately" raised one foot and placed it carefully, "using arm strategies for balance." *Id.* He suggested that she go to the Movements Disorder clinic at Shands if she wanted another opinion. R. 207.

On May 14, 2003, Plaintiff was seen by Dr. Szczesny. R. 223. She was in a wheelchair. *Id.* Dr. Szczesny noted that Plaintiff was in a great deal of pain, was not functioning well, had difficulty walking, but no one had pinpointed the physical cause. *Id.* Dr. Szczesny prescribed Oromorph in an effort to increase functioning by controlling pain in hopes that she would "avoid disability." *Id.*

On June 19, 2003, Plaintiff was seen on a consultative basis by Dennis Greene, M.D., at the Mayo Clinic. R. 514. She was in a wheelchair and could not get up from the wheelchair. R. 515. On examination, he found that she had no nystagmus. R. 516.

Dr. Greene could not provide a unifying diagnosis. *Id.* He noted that all possible causes of her "drop attacks" had been ruled out by specialists in Tallahassee. *Id.*

Plaintiff was seen by Thomas D. Rizzo, M.D., on a consultative basis on July 8, 2003. R. 509. She said that she had undergone balance therapy in March, but this made her balance symptoms worse. R. 510. Dr. Rizzo's neurological examination revealed good strength, brisk reflexes, no clonus, but difficulty standing and discomfort in the SI joints. R. 510-511. She had no pain in active and passive range of motion of the hips and knees. R. 511. Dr. Rizzo thought that Plaintiff's symptoms were the result of an "SI dysfunction." *Id.* He thought that she needed physical therapy to stabilize her spine, and should "avoid using assistive devices [i.e., the wheel chair], if at all possible." *Id.*

On October 14, 2003, Plaintiff was seen by Greg Alexander, M.D. R. 563. Dr. Alexander reviewed an October 2, 2002, MRI and noted "slight degenerative bulging at L2-3, L3-4, and L4-5," without central or neuroforminal narrowing. *Id.* He thought that overall the MRI showed "better than average anatomy for age." *Id.* Plaintiff used a wheelchair. *Id.* On examination, Dr. Alexander observed hyperlordosis of the lumbar spine, normal range of motion, no detectable muscle spasm, symmetric diminished reflexes in the lower extremities, and no muscle atrophy. *Id.* He said: "Gait, balance, and coordination are normal." *Id.* Dr. Alexander said that his findings that day were "normal with the exception of findings suggestive of meralgia paresthetica."[7] *Id.* Dr.

---

[7] Meralgia paresthetica is numbness and tingling on the front and side of the thigh, occasionally with pain; it is due to entrapment of the lateral femoral cutaneous nerve at the inguinal ligaments. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Alexander stated: "I have encouraged Marilyn to be more physically active. She is resistant to this suggestion, stating that she is unable to exercise effectively." *Id.* He prescribed Zanaflex. *Id.*

Plaintiff was seen by Charles A. Birbara, M.D., on a consultative basis for a rheumatology evaluation on November 21, 2003. R. 528. She reported that she had had physical therapy, "which helped." *Id.* Dr. Birbara diagnosed "HMS" (hypermobility syndrome) and osteoporosis. R. 531.

On August 20, 2004, Plaintiff was seen by David Bellamy, M.D. R. 560. She was "very tender over the greater trochanter and over the posterior buttock near the SI joint." *Id.* He thought that she had "possible greater trochanteric bursitis and tendinitis in the buttock area." *Id.* He noted "significant degenerative changes in the lower lumbar spine," but the x-rays of her pelvis and lumbar spine showed "no obvious significant abnormalities." *Id.*

Plaintiff was seen by John Agens, M.D., on October 6, 2004. R. 535. She said that the corticosteroid shots in her hip that she had received from an orthopedic physician had given her no relief. *Id.* Nystagmus was found in the "primary position." *Id.* She had a slow, wide gait. *Id.* There were no abnormal neurologic findings. *Id.* Due to Plaintiff's unsteady gait, Dr. Agens decided to repeat the MRI of her head. *Id.* He said that balance problems can be determined by multiple factors, such as problems of the inner ear, vision, brain and spinal cord, and others. *Id.* He said she could have a neurologic manifestation of collagen vascular disease, but he thought this was less likely. *Id.* He also referred Plaintiff to Dr. Kubiak, a psychologist, "for more detailed

memory and psychological testing." *Id*. She had a positive ANA and was to continue

with Dr. Szczesny, a rheumatologist. R. 536.

On October 8, 2004, Plaintiff underwent a brain MRI scan. R. 534. Among the

findings by Richard C. Cory, M.D., were the following:

> Numerous areas of abnormal signal are present in the periventricular and
> subcortical white matter. They number at least 20 to 25. . . . No area of
> abnormal increased signal is seen on the diffusion-weighted sequence to
> suggest an acute ischemic event.

R. 534. None of these lesions appeared to be acute. *Id*. Dr. Cory wrote:

> While these could be due to microvascular ischemic white matter change,
> they are too numerous in this age group to be discounted. Consideration
> to other etiology such as a demyelinating process should be given.
> Gliosis and inflammation/infection may also have this appearance.
> Clinical correlation is recommended.

*Id*.

On October 14, 2004, Plaintiff returned to Dr. Agens. R. 572. He said that the

abnormal white areas in her brain as revealed by the MRI might be the result of tiny

strokes in the brain caused by high blood pressure or high cholesterol, though he

thought there were too many for that cause, and could also be damage from multiple

sclerosis or an illness like lupus. *Id*. He planned to send Plaintiff to Dr. Maitland for her

balance disorder, noting that previously she may have seen him for a neuro-

opthalmologic evaluation. *Id*.

On May 13, 2005, Plaintiff was seen by Dr. Agens. R. 1087. She reported that

she had had intermittent leg pain for two years, but it had become worse the night

before, and she was using a wheelchair. *Id*. She said she used her wheelchair about

once a month. *Id*. Plaintiff denied suffering depressed mood on most days, and denied

sleep or appetite disturbance. R. 1088. Reviewing x-rays, Dr. Agens found no major

problems with Plaintiff's cervical spine. *Id.* Dr. Agens said:

> Because of the patient's weakness in the legs I ordered an MRI of the
> cervical spine as well, but the intermittent nature of the weakness, the
> optic atrophy, the white matter lesions on the MRI all suggest that this may
> be multiple sclerosis.

R. 1088.

An MRI of Plaintiff's cervical spine on May 1, 2005, revealed focal spondylosis at

C4-C5 with predominate right sided findings. R. 1091. On July 16, 2005, Dr. Agens

examined Plaintiff. R. 1079. He found a "little bit of tenderness in the paraspinal

muscles, but not in the lumbar spine," and some tenderness in the sacroiliac area. *Id.*

He prescribed OxyContin to try to "manage her pain as best we can." R. 1080. Dr.

Agens asked Plaintiff to increase her physical activity. *Id.*

On August 22, 2005, a receptionist in Dr. Agens's office saw Plaintiff's legs

buckle and "her body position was observed to be lowering herself toward her left

shoulder with the impact on the left shoulder." R. 1073. Plaintiff was immediately

examined by Dr. Agens, and she had normal vital signs except for slightly elevated

blood pressure, and had normal strength. *Id.* Dr. Agens offered to send Plaintiff to the

hospital to look for stroke, though he could not see any evidence to justify such a

referral, and she elected to go home. *Id.* Dr. Agens recommended that Plaintiff lose

weight (she then weighed 245 pounds), stay physically active, and lower sodium intake.

*Id.* Dr. Agens noted the diagnosis of depression, but Plaintiff declined to see a

psychologist. R. 1074. He also noted that prior investigations into why the falls were

occurring had been "unrevealing."  *Id.*  He again recommended Tai Chi as an exercise to reduce falls.  *Id.*

Another MRI of Plaintiff's brain on October 24, 2005, had much the same findings as the year before.  R. 1064.  The lesions were "numerous for patient's stated age, but nonetheless nonspecific in nature."  *Id.*  It was noted:

> Although in the appropriate clinical setting this could reflect demyelinating damage the appearances certainly could be associated with other entities such as chronic [illegible] vessel disease, particularly if the patient has a history of diabetes, [illegible] hypertension or even migrainous cephalalgia.

R. 1064.

On January 6, 2006, an EMG[8] of Plaintiff's lower spine revealed an abnormality, "evidence of a chronic, inactive right L4 radiculopathy."  R. 991.  On January 25, 2006, Plaintiff had an MRI of her spine.  R. 990.  There was no evidence of a demyelinating process in the thoracic spinal cord.  *Id.*  Very minimal bulges were seen at T1-T2, T8-T9, T10-T11, and T11-T12.  *Id.*  It was found that:  "T2 signal loss is present at the disc spaces from L2-L3 through L4-L5 levels, compatible with mild disc dessication."  *Id.*  Mild disc bulges were also observed at these lumbar levels, and there was signal abnormality suggestive of an annular tear.  *Id.*

Plaintiff was examined by Paul W. Brazis, M.D., on January 27, 2006, to determine possible visual impairment.  R. 609.  Plaintiff had had recurrent episodes of eye pain and inflammation, diagnosed as uveitis or iridocyclitis.  *Id.*  There was no

---

[8] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

uveitis on examination.  R. 611.  Dr. Maitland's earlier findings, that Plaintiff had an

enlarged nonreactive pupil on the right side, was noted.  R. 609.  Plaintiff said that she

was then suffering from recurrent headaches and some blurred vision.  R. 610.  The

optic nerves were found to be without any true optic neuropathy.  R. 610-611.  She

exhibited horizontal nystagmus on lateral gaze that could be related to impairment of

her brainstem vestibular connections.  R. 611.  He thought that the white matter in her

brain "could be compatible with either myelinating disease, diffuse ischemic changes as

may be seen with migraine or alternatively could be related to diffuse collagen vascular

process."  R. 612.  His final diagnosis was recurrent uveitis, bilateral cataracts, enlarged

unreactive right pupil, no evidence of significant optic nerve neuropathy, and nystagmus

perhaps related to vestibular or brainstem impairment, or ischemic changes, or

demyelinating disease.  *Id.*

On May 25, 2006, Plaintiff was discharged from a physical therapy program after

attending eight sessions; the therapy had commenced on March 28, 2006.  R. 842.

Plaintiff had "shown progress with general trunk stabilization & posture."  *Id.*  Her

perception of pain was under control with a TENS unit, but she continued to fall as her

legs gave way, was at great risk for seriously injuring herself, and continued to

experience tingling and numbness in her lower extremities.  *Id.*

On June 9, 2006, Plaintiff reported that her pain had improved with the TENS

unit, but sitting for about an hour caused her legs to "give out" for a whole day.  R. 867.

On August 1, 2006, Plaintiff was working for Dial-A-Ride as a driver but this was

aggravating her lower spine radiating to her right leg.  R. 864.  She had not fallen.  *Id.*

Her lower spine was tender to palpation.  R. 866.  Her gait and balance were "intact."

*Id*.  She could not rise from a chair without holding on.  *Id*.

On September 15, 2006, Plaintiff was seen by Charles A. Birbara, M.D.,

complaining of pain in her middle lumbar-sacral area radiating to her right hip.  R. 853.

She said that she had had four to six months relief with the last injections, but she also

said that the injections were "no help."  *Id*.  She said that sitting was the worst.  *Id*.  She

had an MRI of her cervical spine on September 11, 2006.  *Id*.  That MRI showed stable

"very nonspecific" white matter lesions unchanged from the October 8, 2004, MRI.  R.

1030.  Plaintiff also had an MRI of her cervical spine on September 11, 2006.  R. 1031.

The impression was:

> Cervical spondylosis and degenerative disc disease changes with disc
> bulges at C4-5 and C6-7 with borderline stenosis at C4-5.  Cord
> compression at that level.  Questionable mild effacement at C6-7 of the
> cord but no definitive deformity. . . .  I see no acute abnormality.

R. 1031.  The disc bulge at C4-5 was "much more pronounced" than at C3-4.  *Id*.

On October 23, 2006, Plaintiff was seen by Dr. Agens complaining of the same

symptoms.  R. 854.  She had numbness in her legs, and periods of "abject, profound

weakness where she can barely move."  *Id*.  On examination, her memory was intact,

she was alert, could walk on heels and toes, and was not anxious or depressed.  R.

856.

On February 27, 2007, Plaintiff was seen by Joshua Fuhrmeister, M.D., at the

Division of Pain Management, Tallahassee Neurological Clinic.  R. 969-972.  She

complained, *inter alia*, of joint pain, joint swelling, back pain, muscle weakness, difficulty

with concentration, numbness, falling down, tingling, and brief paralysis, but denied

muscle aches, poor balance, headaches, disturbances of coordination, inability to speak, visual disturbances, seizures, tremors, dizziness, fainting, or memory loss.  *Id*. She had "severe tenderness to palpation in the midline low back at the lumbosacral junction."  R. 972.  It was noted that she had had injections with excellent pain relief until recently.  *Id*.  Dr. Fuhrmeister determined that SI or trochanteric injections were not necessary given the reported location of the pain.  *Id*.  He planned right sided L5-5 and L5-S1 facet joint injections and a deep midline trigger point injection.  *Id*.  The injections were given on March 9, 2007.  R. 967-968.  On March 26, 2007, Plaintiff reported very good relief from the injections and was overall "feeling a lot of improvement."  R. 963.

On March 13, 2007, Plaintiff was seen by Dr. Agens.  R. 1011.  She said that she suffered profound weakness about twice a week, and her condition was getting worse. *Id*.  Her last episode, she said, was the day before.  *Id*.

On March 26, 2007, Plaintiff was seen by Dr. Ayala.  R. 947.  He found that her gait was normal, and her strength in her upper and lower body was normal.  R. 950.  He recommended that she proceed with EEG[9] studies.  R. 951.  He determined that the multiple soft tissue injuries in her head, neck, and back were related to falls.  R. 947. He also noted that she had been tested at the Mayo Clinic, no specific pathology was found, and she was "basically told or she understood to learn to live with the condition." R. 947.

---

[9] Electroencephalogram.  Electroencephalography is a process for tracing of the electric impulses of the brain.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On March 25, 2007, Plaintiff had a CT scan of her head.  R. 893.  The result was normal.  *Id*.  On March 26, 2007, she had an EEG.  R. 946.  There was no gross pathology, no epileptiform discharges, and the results were "unremarkable."  *Id*.

On March 28, 2007, Plaintiff was admitted to the Tallahassee Memorial Hospital after presenting at the emergency room with "reports of global weakness."[10]  R. 901.  She denied being in pain.  R. 909.  J. M. Murphy, M.D., said that Plaintiff "had weakness of both the upper and lower extremities, just barely raising the extremities against gravity; however, hand grasps bilaterally are 4 out of 5."  R. 904.   Dr. Murphy said that Plaintiff did well during her overnight stay and he noted that she had been seen by L. D. DaSilva, M.D.  R. 901.  Dr. Murphy thought it was possible that Plaintiff's global weakness was "secondary to a functional disorder," referring to Dr. DaSilva's findings.  *Id*.

Dr. DaSilva noted that that on the morning of March 28, 2007, Plaintiff was driving a bus and felt a sudden onset of weakness starting in her legs and ascending.  R. 876.  *Id*.  She had been brought to the hospital emergency room.  *Id*.  She said that the experience of weakness used to happen two or three times a year and now happened two or three times a week.  *Id*. Dr. DaSilva said that this was "not associated with stress or any other triggers."  R. 900.   Dr. DaSilva could find no cause for Plaintiff's "meltdown," but said: "I would most likely present the underlying psychiatric

---

[10] This is the event described in Plaintiff's testimony, the event that caused her to again stop working.

manifestation conversion disorder"[11] and suggested that Plaintiff consult a psychiatrist. R. 878.   On June 16, 2007, Plaintiff had the psychological consultative examination by Larry Kubiak, Ph.D., described ahead.  R. 915-922.

On April 9, 2007, Plaintiff was admitted to the hospital for four days of video EEG monitoring.  R. 808.  After discharge, Dr. DaSilva noted that during monitoring, she "has multiple events, all demonstrated to be typical."  *Id.*  He had "no results of the event monitoring at this time."  R. 885.  He also said that she underwent "induction" with "normal saline," which "was demonstrated to be unremarkable."  *Id.*  Dr. DaSilva noted that she had a history of "paroxysmal paraplegia" that had evolved into "quadriplegia."  *Id.*  He also noted again that Mayo Clinic had found no pathology.  *Id.*

On April 20, 2007, Dr. Ricardo Ayala at the Tallahassee Neurological Clinic referred to the EEG video monitoring and said that the results had suggested that Plaintiff "has quite frequent nonepileptic events occurring spontaneously and also triggered by IV saline induction."  R. 952, 937.  He said that "over the years we have been looking for physical cause[s] of her so-called episodes of generalized weakness, falling episodes, temporary unconsciousness, amnestic spells and others but there could also be room for psychologically related reasons."  *Id.*  He said:  "Such reasons are not apparent or know to me."  *Id.*  He suggested that she go to Shands Hospital in

---

[11] Conversion disorder or conversion reaction is a somatoform disorder characterized by symptoms or deficits affecting voluntary motor or sensory functioning and suggesting physical illness but produced by conversion.  A person's anxiety is "converted" into any of a variety of somatic symptoms such as blindness, deafness, or paralysis, none of which have any organic basis.  The anxiety may be the result of an inner conflict too difficult to face, and symptoms are aggravated in times of psychological stress. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Gainesville, Florida, to the epilepsy department for a comprehensive neurological and

psychological evaluation. *Id.* He noted that Mayo Clinic found no specific pathology.

*Id.* His impression was paraparesis, nonepileptic in nature. *Id.*

On May 11, 2007, during a followup visit to Dr. Fuhrmeister, Plaintiff had set of

injections. R. 958-962.

On September 13, 2007, Plaintiff had another MRI of her brain and cervical

spine. R. 923-924. The brain MRI revealed much the same as previous scans: multiple

"punctate foci of hyperintense T2 signal" with perhaps a few more than the last scan,

and more numerous than "typical for age." R. 924. The "differential diagnosis includes

demyelination including MS. This could also be due to remote traumatic, ischemic or

infectious etiology." *Id.* The impression from the cervical MRI was that Plaintiff had

degenerative disc disease of the cervical spine "most pronounced at C4-5 with mild

spinal stenosis," and "mild degenerative disc disease at C6-7," with no significant

interval change from the prior MRI. R. 925.

On September 17, 2007, Plaintiff spent two days at Shands Hospital undergoing

24 hour EEG video monitoring. R. 1106. Stephen Eisenschenk, M.D., discussed the

findings. *Id.* He said she had two "typical episodes of weakness." R. 1106. "These

were determined to be non-epileptic event[s] consistent with a possible conversion

disorder." *Id.* Dr. Eisenschenk said: "I discussed extensively with her that I believe

these events are more likely consistent with a conversion disorder," and he thought that

"it would be of benefit for her to be followed by psychology locally to assist with her

current medical condition." R. 1107.

On October 3, 2007, Plaintiff again saw Dr. Ayala.  R. 926.  Dr. Ayala noted that Plaintiff was "willing to be open to the idea that indeed she could be experiencing conversion reactions that could probably be related to chronic anxiety and depression." *Id*.  He said that the EMG at Mayo Clinic suggested that she had had an injury to the nerve at L4 in the past, but that the injury was no longer active.  *Id*.  Plaintiff was concerned that she was getting weaker over time, but Dr. Ayala said he "cannot find anything that would suggest that she has a progressive disease and I think [it] is more important to address issues that maybe we have more control over such as the issue of conversion reaction and anxiety with depression." *Id*.  He said that he did not believe that she had an infectious process or demyelinating disease and did not need to get a lumbar puncture.  *Id*.

### Mental health evidence

On November 23, 2002, Plaintiff was examined on a consultative basis by Trina L. Christner, Psy.D.  R. 153.  Plaintiff said that she had had to leave her last job (scheduling transportation for the elderly and handicapped) in May, 2002, because she was too weak and not feeling sufficiently confident. R. 155.  She said that she had forgotten to schedule rides and had left her clients stranded.  *Id*.  She said that her self-care skills were "complete."  *Id*.  She bathed, dined, and dressed herself independently, but needed help to dress when she was experiencing a lot of pain.  *Id*.  She said that she had problems completing household task due to pain.  *Id*.  She said that the "pain creates a cycle by feeding her depression and anxiety." *Id*.  She said that her husband helped with the cooking and cleaning, and she leaves household work incomplete,

paces herself, and her husband completes those tasks. *Id.* She said she no longer

goes on walks for fear of falling, and no longer shops unless someone is with her. *Id.*

Dr. Christner found that Plaintiff had good eye contact, good grooming, was

consistently polite and cooperative, and her "overall activity was appropriate." R. 155.

She occasionally required statements to be rephrased. *Id.* She "sometimes adjusted

herself in her seat as if uncomfortable." *Id.* Her gait appeared to be stiff. *Id.* Dr.

Christner said that Plaintiff's current mood was good, but she cried repeatedly during

the interview. *Id.* She said she had twice tried to commit suicide, at age 18 and 19, but

had not had thoughts of suicide since then. R. 156. Dr. Christner found that Plaintiff's

thought expression was generally coherent but frequently emotional. *Id.* She was

preoccupied with health concerns. *Id.* She generally was able to concentrate during

the interview, but had lapses of attention. *Id.* She exhibited word finding difficulty at

one point and began to cry. *Id.* She said she had difficulty remembering names,

conversations, or things she had done or not done. *Id.* Dr. Christner said that her

difficulties with memory may be related to the lesions on her brain and anxiety. *Id.* Dr.

Christner concluded:

> **Prognosis**. Prognosis is guarded to poor. Ms. Lewis has difficulty
> completing routine self-care tasks due to anxiety, panic, restricted range of
> motion, pain, difficulty bending, and difficulty lifting objects. She would
> likely show difficulties on the job attempting to execute routine job
> responsibilities. She tires easily and may have difficulty getting out of bed
> due to anxiety, therefore, she may be absent from work frequently.
> Symptoms would worsen with increased stress. She would likely have
> difficulty adapting to change.
>
> **Concentration and task persistence.** Ms. Lewis experiences lapses in
> attention, concentration, and memory, likely due to lesions in her brain and
> to symptoms of anxiety. She may become distracted by emotional,
> physical, financial, and family problems. Problems with concentration

would interfere with performance and persistence at a job. Memory problems may hinder her ability to adapt to normal work routines. Symptoms of panic would interfere with her ability to stay focused on tasks.

R. 156. Dr. Christner also thought that while Plaintiff "generally executes immediate needs independently," she "may not be able to complete tasks on her own" at times. R. 157. She thought that Plaintiff "would likely have problems relating to co-workers and supervisors due to her physical limitations and mental condition. . . . Progressive lesioning of her brain would most likely lead to increased deficits in adaptive daily functioning and in memory." *Id.* Dr. Christner thought that Plaintiff would have problems on any job due to "lapses in attention, concentration, and memory . . . ." She entered the following diagnoses on Axis I: Major Depressive Disorder, Recurrent, Moderate; Panic Disorder with Agoraphobia (Provisional); and Pain Disorder Associated With Psychological Factors. *Id.* On Axis V[12] she assigned a GAF score of 53.[13] *Id.* Dr. Christner recommended that Plaintiff seek a referral for a neuropsychological evaluation that might "aid in clarification of Ms. Lewis' clinical presentation and help pinpoint deficits in current daily, adaptive functioning." *Id.*

---

[12] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[13] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002). A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers). *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

Plaintiff was referred for another consultative mental status examination on January 31, 2003. R. 158. The examination was conducted by Marie P. Hume, Ph.D. *Id.* Dr. Hume found Plaintiff to be "entirely cooperative with the interview and testing," and found that she "appeared to be a reliable and sensible informant." *Id.* Plaintiff reported that she was "currently capable of completing all basic activities of daily living," including personal hygiene, cooking, cleaning, doing the laundry, and organizing her residence, but her husband helped her a lot. *Id.* She also reported that when she is weak, she has difficulty walking and sometimes has to crawl. *Id.* Dr. Hume found that Plaintiff "did not display any difficulties in attention or concentration." R. 159. Dr. Hume said: "Once the evaluation was over, she was unable to stand up. The examiner had to get her wheel chair from the car." *Id.* Dr. Hume said that Plaintiff had a good attitude during testing, was persistent, and worked very hard. *Id.* She found that the memory portion of the test was more difficult for Plaintiff. *Id.* Dr. Hume thought that the test results were "a valid estimate of her current level of functioning in the areas assessed." *Id.* Her scores on the Wechsler Memory Scale III were in the average or low average range. R. 160-161. He thought that "the vast majority of her memory abilities are consistent with her estimated intelligence." R. 161. Dr. Hume's diagnosis was Major Depressive Disorder, Recurrent, Mild to Moderate, and Pain Disorder Associated with Psychological Factors. *Id.* Dr. Hume thought that Plaintiff's prognosis was poor. *Id.*

On February 26, 2003, a non-examining clinical psychologist reviewed the records. She determined that Plaintiff suffered no limitations or only mild limitations from affective disorder. R. 182,192.

On July 1, 2005, Dr. Hume Guilford again examined Plaintiff. R. 584. Plaintiff said that she had taken Prozac in 2001, but she stopped taking it because she "was getting depressed;" she later started taking Prozac again, but stopped again due to the side effects. R. 584-585. Plaintiff said that her depression was a "daily battle." R. 585. She said that she forced herself to get out of bed every day and not give in to depression. *Id.* She took elderly friends to the store and went to bible studies. *Id.* She said that her experience of depression dated back 25 years. *Id.* Dr. Hume Guilford noted that her 2003 testing of Plaintiff for memory problems "did not indicate significant cognitive impairment." *Id.*

Plaintiff reported to Dr. Hume Guilford that she took Relafen for inflammation, but it caused her to sweat, and she occasionally took Percocet for pain to help her sleep. R. 585. She said that she has inflammation in her hips, and that she has difficulty walking and sitting. *Id.* She said that this condition had worsened since 1997. *Id.*

Plaintiff told Dr. Hume Guilford that she had tried to work one day a week delivering the Thrifty Nickel newspaper, but her legs were becoming numb. R. 586. At home, she tried to keep the kitchen clean and her bed made. *Id.* She vacuums once or twice a month. R. 587. She said that she is able to do all basic activities of daily living except when she is unable to walk. *Id.* She said that vacuuming put pressure on her lower spine and "it won't be long until my legs don't work." *Id.* She said that physicians thought that she had multiple sclerosis, but do not think that now, but that she has "bouts of weakness, periods where I can't walk and intense pain." *Id.* She said that the pain medications made her nauseous. *Id.*

On examination, Dr. Hume Guilford found that Plaintiff was fully alert, aware,

cooperative, and polite, and her mood was within normal limits.  R. 587.  She had no

perceptual disorders.  *Id.*  Dr. Hume Guilford said that when the interview ended, and

Plaintiff was told that no additional testing would be done, she "looked somewhat

upset."

> When she stood up to leave she had a very dramatic fall that took several
> seconds from beginning to end.  Her hands shot up, she wobbled on her
> feet, then proceeded to spin completely around, eventually making her
> way to the floor.  The miracle is that she did not bang her head on either
> the table or the chair, as she spun herself around completely between the
> two, waved her arms around, and ultimately managed to land right
> between the two major obstacles, only scraping her elbow lightly on the
> chair.

R. 587.  Plaintiff asked to be wheeled out to her car in her wheelchair.  *Id.*  The

wheelchair was placed in the trunk of her car, "where she keeps it," and she promptly

left.  *Id.*  Dr. Hume Guilford's diagnosis on Axis I was Major Depression, Mild, Pain

Disorder with Psychological Factors, and rule out Somatic Disorder, NOS.  R. 588.  On

Axis II, the diagnosis was Personality Disorder.  *Id.*  Dr. Hume Guilford reviewed the

results of MMPI-II, finding that Plaintiff's profile was of a depressed person who was a

poor candidate for therapy because persons in that profile "lack introspection and will

tolerate a great deal of unhappiness without feeling motivated to change their situation."

R. 588.  Her prognosis was guarded, and she said there may be "some reason to

believe there may be some psychosomatic process going on."  *Id.*  She thought that

Plaintiff had only slight impairment of ability to understand and remember detailed

instructions, carry out detailed instructions, and make judgments on simple work-related

decisions.  R. 590.  She thought that Plaintiff would have moderate difficulties in

responding appropriately to work pressure and changes in a work setting. R. 591. It was also noted by Dr. Hume Guilford that Plaintiff had a long history of depression, had difficulty coping with pain and stress, and she thought that this difficulty would sometimes interfere with her cognitive functioning. R. 590.

On June 26, 2006, Dr. Agens referred Plaintiff to Dr. Faisal A. Munasifi for treatment of depression. R. 851. Dr. Munasifi conducted the evaluation on August 3, 2006. R. 845. Plaintiff reported that for the past several years she had had "daily fights" "to overcome feeling overwhelmed or a sinking feeling." *Id.* She had been told for "years" to see a psychiatrist. *Id.* Plaintiff enjoyed "ministry, Jehovah's Witness," and had "overwhelming anxiety regarding health." *Id.* Plaintiff said she could not sit down, and had to "pace." *Id.* She said she could not stay long for the psychiatric evaluation. *Id.* Dr. Munasifi found her mood to be anxious, and her affect tense, but her memory was intact and she was alert and oriented. *Id.* His diagnosis on Axis I was Adjustment Disorder, with depressed mood, rule out Dysthymic Disorder and Chronic Depression. *Id.* He assigned a GAF score of 60 to 70.[14] R. 846. On follow-up, Plaintiff said that she had read about Lexapro[15] and Cymbalta[16] and she declined to take these medications

---

[14] A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning ( e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[15] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[16] Cymbalta is used to treat major depression. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

because she did not want any side effects and did not want anything to interfere with her driving. R. 844. Counseling was recommended, but Plaintiff declined. *Id.* Omega-3 fatty acids were recommended. *Id.* Her memory and thinking were normal. *Id.*

Plaintiff was referred for another psychological evaluation on June 16, 2007, by Larry Kubiak, Ph.D. R. 915-922. Plaintiff said she had a prescription for Prozac, but was not taking it "because of money issues." R. 916. Plaintiff admitted that she was obsessed with her health. *Id.* Plaintiff reported that her father was an alcoholic, her sister had ADHD, two sisters had major depression, one sister had had inpatient psychiatric treatment, her daughter suffered from major depression, and she thought that her son was bipolar and had anxiety disorder. *Id.* Plaintiff said that she periodically slept for two to three days at a time. *Id.*

Plaintiff reported that her mood changed unpredictably. R. 916. She said that she had been involved in 11 motor vehicle accidents. R. 917. On a self-reporting form, Plaintiff reported a high number of symptoms for a diagnosis of ADHD, but not quite enough to meet the diagnostic criteria. R. 917. Dr. Kubiak determined that her test scores were valid. *Id.* He said that the MMPI II produced "a valid profile" that suggested:

> a high level of somatic complaints, anxiety, subjective depression, psychomotor retardation, physical malfunctioning, mental dullness, lassitude malaise, familial discord, social, self, and emotional alienation, difficulty controlling her thoughts and emotions, defective inhibitions, bizarre sensory experiences, and ego inflation.

R. 919. Plaintiff tested high on the "anxiety, obsessions, health concerns, low self-esteem, social discomfort, work interference and negative treatment indicators." *Id.* On

another scale, it was suggested that Plaintiff was "not well put together psychologically and tends to be extremely passive." *Id.*

Dr. Kubiak's diagnosis on Axis I was Post Traumatic Stress Disorder, Rule Out Obsessive Compulsive Disorder, Major Depression, and Dysthymia. R. 921. On Axis II he determined that she had a depressive personality disorder with avoidant features, a dependent personality disorder, and a self defeating personality disorder with borderline features. *Id.* On Axis V he assigned a GAF score of 40.[17] *Id.* He recommended psychotropic medication and individual therapy. *Id.* He said that Plaintiff was experiencing a high level of stress and low self-esteem. *Id.*

**Legal analysis**

**Whether the ALJ erred in evaluating Plaintiff's mental impairments**

This case was previously before this court as case number 4:06cv291-MP/WCS. Defendant asked that the claim be remanded pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), so that the ALJ could

> re-evaluate Plaintiff's mental impairments, paying particular attention to all of the medical evidence, including the diagnoses of the treating and consultative examiners. In addition, the ALJ will append to his decision a copy of the psychiatric review technique form (PRTF) or incorporate its mode of analysis into his findings and conclusions. . . . If the ALJ does

---

[17] A GAF score of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp. A GAF score of 41-50 indicates: "Severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational or school functioning ( e,g., no friends, unable to keep a job )." *Id.*

> find that Plaintiff has a severe mental impairment, he will include
> limitations as a result of that impairment in his residual functional capacity
> (RFC) finding. Finally, if the ALJ finds that Plaintiff can perform her past
> relevant work, the ALJ will make explicit findings regarding the actual
> physical and mental demands of Plaintiff's past work and compare the
> actual demands of the past work with Plaintiff's residual functional
> capacity.

R. 753-754. This court granted this motion and remanded on January 24, 2007. R.

749-750. The Appeals Council remanded for "further proceedings consistent with the

order of the court." R. 759. The Appeals Council noted that in the prior decision, the

ALJ had found that Plaintiff "suffers from a severe affective disorder," but did not

discuss non-exertional limitations caused by the affective disorder. R. 758. The

Appeals Council also noted that there was evidence of a pain disorder, "associated with

psychological factors," and this was not mentioned by the ALJ. R. 758-759. The

Appeals Council criticized the prior decision for not containing "findings of fact as to the

physical and mental requirements of the past work." R. 759.

Unfortunately, for a case with such a lengthy medical record and history, it must

be concluded that the ALJ did not properly comply with these instructions. The ALJ

discussed all of the mental health evaluations noted above, R. 735-739, and, contrary to

the earlier determination on the same evidence, determined at step 2 that Plaintiff's

"depressive disorder and panic disorder" are not severe. R. 739. He determined that

Plaintiff had only mild limitations in activities of daily living, social functioning,

concentration, persistence and pace, and had no episodes of decompensation. *Id.*

Hence, thereafter he did not "include limitations as a result of that impairment in his

residual functional capacity (RFC) finding," and he did not "make explicit findings

regarding the actual physical and mental demands of Plaintiff's past work and compare the actual demands of the past work with Plaintiff's residual functional capacity."

Plaintiff contends that the ALJ's finding at step 2, that Plaintiff's depression and panic disorders are not "severe" impairments, is error. Doc. 10, p. 19. Plaintiff also argues that the ALJ failed to accurately assess Plaintiff's mental limitations in determining her residual functional capacity at step 4. *Id.*, p. 18. Plaintiff argues that "[s]ubstantial evidence does not support a finding that claimant can perform her past relevant work when it is based upon an incomplete and inaccurate RFC assessment." *Id.* Finally, Plaintiff argues that it was error to fail to consider Plaintiff's pain disorder since that disorder was a part of the remand. *Id.*, p. 23.

Defendant asserts that the ALJ's finding that Plaintiff's depressive and panic disorders are not "severe" (because they do not pose more than mild limitations upon her activities of daily living) is supported by substantial evidence in the record. Doc. 15, pp. 4-5.

Defendant notes that Dr. Christner said that "Plaintiff was able to attend during the examination and that she was generally able to complete her daily activities." *Id.*, p. 5, citing R. 156-157. This is not substantial evidence for the finding that Plaintiff has only mild limitations of activities of daily living. Dr. Christner did say that Plaintiff's self-care skills were "complete," but she also said that while Plaintiff bathed, dined, and dressed herself independently, she needed help to dress when she was experiencing a lot of pain. R. 155. She also said that Plaintiff had problems completing household task due to pain. *Id.* She said that the "pain creates a cycle by feeding her depression and anxiety." *Id.* She said that Plaintiff's husband helped with the cooking and cleaning,

and that Plaintiff leaves household work incomplete, paces herself, and her husband completes those tasks. *Id.* She said Plaintiff no longer goes on walks for fear of falling, and no longer goes shopping unless someone is with her. *Id.* Dr. Christner said that:

> Prognosis is guarded to poor. *Ms. Lewis has difficulty completing routine self-care tasks due to anxiety, panic, restricted range of motion, pain, difficulty bending, and difficulty lifting objects. . . .*

R. 156. Dr. Christner also thought that while Plaintiff "generally executes immediate needs independently," she "may not be able to complete tasks on her own" at times. R. 157.

Defendant also argues that Dr. Hume found that Plaintiff "was able to complete all basic daily activities." Doc. 15, p. 5, citing R. 158. Dr. Hume said in the first examination that Plaintiff reported that she was "currently capable of completing all basic activities of daily living," including personal hygiene, cooking, cleaning, doing the laundry, and organizing her residence, but her husband helped her a lot. R. 158. On July 1, 2005, Dr. Hume Guilford reported that Plaintiff said that her depression was a "daily battle." R. 585. She said that every day she forced herself to get out of bed and not give in to depression. *Id.* She took elderly friends to the store and went to bible studies. *Id.* Plaintiff said that she had tried to work one day a week delivering the Thrifty Nickel newspaper, but her legs became numb. R. 586. At home, she tried to keep the kitchen clean and her bed made. *Id.* She vacuumed once or twice a month. R. 587. She said that she was able to do all basic activities of daily living except when she is unable to walk. *Id.* She said that vacuuming put pressure on her lower spine and "it won't be long until my legs don't work." *Id.* This is not substantial evidence to conclude that Plaintiff had only *mild* limitations of daily activities.

In addition, the ALJ failed to discuss the lay evidence as to Plaintiff's ability to do daily activities. An earlier administrative hearing was held on May 6, 2005. R. 690. Plaintiff's husband, Persley Lewis, testified that when his wife had the newspaper route, he had to help her deliver the papers. R. 721. He said that there were things she could not do around the house. *Id.* He said:

> She cannot maintain the home by herself. I have to help clean the house. So I, and I have to do grocery shopping, things like that. I have to wash clothes because she is not able to do all the household chores that [a] housewife would normally do with a working husband.

*Id.* He said that Plaintiff could cook, and was a "pretty good cook," but she did not do it every day. R. 722. The ALJ did not discuss this evidence, or give a reason to disbelieve it.

The ALJ also did not consider a statement by Joann Burgess, Plaintiff's neighbor. That statement, dated December 17, 2002, said that Plaintiff's husband took care of the housework, grocery shopping, cooking, and finances, and that on a good day, Plaintiff could cook a meal and run a vacuum, but the good days were "few and far between now." R. 126.

The burden upon Plaintiff to prove at step 2 that she has a "severe" impairment is very light. At step 2, the issue is whether Plaintiff has shown that he has a condition which has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of

age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir.
1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler,
736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274. "Step two is a
threshold inquiry. It allows only claims based on the most trivial impairments to be
rejected. The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d
1026, 1031 (11th Cir. 1986) (clarifying Brady). A "severe impairment" is a "de minimis
requirement which only screens out those applicants whose medical problems could
'not possibly' prevent them from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9
(11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985). It also
has been characterized by the Supreme Court as a criterion which identifies "at an early
stage those claimants whose medical impairments are so *slight* that it is unlikely they
would be found to be disabled even if their age, education and experience were taken
into consideration." Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting*
Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

Accordingly, given the very mild burden of proving a step 2 impairment, the ALJ's
determination that Plaintiff's mental impairments do not pose more than a mild limitation
upon her activities of daily living, R. 739, and that her mental impairments are not
"severe" as meant at step 2 is not supported by substantial evidence in the record.

An additional error is noted. When considering at step 2 whether Plaintiff had
"severe" mental impairments, the ALJ failed to consider Plaintiff's pain disorder, R. 759,
even though that was specifically a part of the remand.

Even if there is error at step 2, however, a remand is not needed if the error was
harmless. A step 2 error may be harmless if the ALJ considered the limiting effects of

the impairment at each succeeding step, along with other impairments.  Riepen v.

Commissioner of Social Sec., 198 Fed.Appx. 414, 415 (6th Cir. Oct 10, 2006) (not

selected for publication in the Federal Reporter, No. 05-2407); Reed-Goss v. Astrue,

291 Fed.Appx. 100, 101 (9th Cir. Aug 25, 2008) (not selected for publication in the

Federal Reporter, No. 07-35477); Newton v. Astrue, 2008 WL 915923, *10 (N.D. Ga.

Apr 01, 2008) (No. CIV.A.1:06CV1542AJB).

The ALJ here, however, did not properly consider the evidence of Plaintiff's

depression, panic disorder, pain disorder, and other evidence concerning her mental

health, in determining her residual functional capacity at step 4.  Having found that

Plaintiff's mental impairments were not "severe," he later only mentioned mental health

evidence as he determined the credibility of Plaintiff's testimony describing her

impairments and symptoms.  R. 740-742.  He did not directly evaluate the mental health

evidence as bearing upon the issue of Plaintiff's residual functional capacity.

To complicate matters, it is uncertain whether the ALJ followed this Circuit's

standard when he determined Plaintiff's credibility.  This Circuit's standard for evaluating

a claimant's testimony as to symptoms, including pain, is:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) *evidence of an underlying medical condition*; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) *that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added).  The ALJ

first said:  "After considering the evidence of record, the undersigned finds that the

claimant's *medically determinable impairments could have been reasonably expected to*

*produce the alleged symptoms*, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 741 (emphasis added). This, standing alone, is internally inconsistent. If the medically determinable impairments (the first part of the test) could reasonably be expected to give produce the alleged symptoms (part 2(b) of the test), then the ALJ should have believed Plaintiff.[18] A few sentences later, however, the ALJ wrote: "The objective medical evidence . . . fails to establish an underlying medical condition that could reasonable be expected to produce incapacitating symptoms." R. 741. (emphasis added). This, at least, addresses the relevant legal issue, but the two sentences are inconsistent with each other.

In beginning the analysis of Plaintiff's credibility, the ALJ first observed that *Plaintiff testified* that her physicians "have stated that they [the falling down episodes] are due to depression and anxiety." R. 741. That is an appropriate focus for judging the Plaintiff's credibility, but Plaintiff is not a medical expert. The passage continues with an evaluation of Plaintiff's credibility, not an evaluation of the weight to be given to the opinions and findings of examining psychologists. R. 741-742.

Thereafter, the only mental health impairments discussed are those from Plaintiff's testimony, that she said that she has an inability to concentrate and has memory deficits. R. 742. The ALJ discounted this testimony because Dr. Hume had noted that Plaintiff "was in full control of her hygiene, cooking, cleaning, laundry tasks, and organizing her residence. *Id*. This particular reason for discounting Plaintiff's

---

[18] This stock sentence commonly appears in the decisions of Administrative Law Judges in Social Security cases. It makes no sense.

testimony is not supported by substantial evidence in the record, discussed above.  The

mental health evidence uniformly indicates that Plaintiff's ability to perform activities of

daily living is impaired, at least to the extent of a "severe" impairment as intended at

step 2.

The ALJ also discounted Plaintiff's testimony concerning her problems with

concentration and memory because there was evidence from intelligence testing that

Plaintiff was functioning in the average range of intellectual functioning, and memory

testing showed that she was functioning consistent with her estimated intelligence.  R.

742.  This finding of no impairment of concentration and memory *at all* is not supported

by substantial evidence in the record.  In the second examination, Dr. Hume Guilford

said that although Plaintiff had only slight impairment for ability to understand and

remember detailed instructions, carry out detailed instructions, and make judgments on

simple work-related decisions, R. 590, she thought that Plaintiff would have moderate

difficulties in responding appropriately to work pressure and to changes in a work

setting.  R. 591.  She noted that Plaintiff had a long history of depression, had difficulty

coping with pain and stress, and she thought that this difficulty would sometimes

interfere with her cognitive functioning.  R. 590.

Likewise, Dr. Kubiak found that Plaintiff suffered from a significant mental

impairment.  Dr. Kubiak determined that the MMPI II produced "a valid profile" that

suggested:

> a high level of somatic complaints, anxiety, subjective depression,
> psychomotor retardation, physical malfunctioning, mental dullness,
> lassitude malaise, familial discord, social, self, and emotional alienation,
> difficulty controlling her thoughts and emotions, defective inhibitions,
> bizarre sensory experiences, and ego inflation.

R. 919. Plaintiff tested high on the "anxiety, obsessions, health concerns, low self-esteem, social discomfort, work interference and negative treatment indicators." *Id*. On another scale, it was suggested that Plaintiff was "not well put together psychologically and tends to be extremely passive." *Id*. He assigned a GAF score of 40, which is on the borderline between major and severe impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

Of course, Dr. Christner, who the ALJ directly discounted, had the most to say about Plaintiff's mental impairment, and especially her ability to remember and concentrate. Dr. Christner concluded that Plaintiff's prognosis was guarded to poor. R. 156. She thought that Plaintiff had:

> difficulty completing routine self-care tasks due to anxiety, panic, restricted range of motion, pain, difficulty bending, and difficulty lifting objects. She would likely show difficulties on the job attempting to execute routine job responsibilities. She tires easily and may have difficulty getting out of bed due to anxiety, therefore, she may be absent from work frequently. Symptoms would worsen with increased stress. She would likely have difficulty adapting to change.

R. 156. Dr. Christner also thought that Plaintiff:

> experiences lapses in attention, concentration, and memory, likely due to lesions in her brain and to symptoms of anxiety. . . . Problems with concentration would interfere with performance and persistence at a job. Memory problems may hinder her ability to adapt to normal work routines. Symptoms of panic would interfere with her ability to stay focused on tasks.

R. 156.

The ALJ determined that Dr. Christner's opinion was "inconsistent with the claimant's medical evidence, which does not show regular treatment for a mental impairment and her refusal to take medication for psychiatric complaints." R. 742. This

is not substantial evidence in the record to reject Dr. Christner's opinion. To begin with, Dr. Christner's opinion is quite similar to that of Drs. Hume and Kubiak and the ALJ should have set forth reasons to discount the opinions of Hume and Kubiak as well. Further, the Commissioner may deny benefits "when a claimant, without good reason, fails to follow a prescribed course of treatment *that could restore her ability to work*." McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir. 1988) (emphasis added); Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988); Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990). "In order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored," and this finding itself must be supported by substantial evidence. Dawkins, 848 F.2d at 1213 (citations omitted). The ALJ made no findings that a course of mental health treatment would have restored Plaintiff's mental health so that she could work.

Additionally, poverty excuses noncompliance. Dawkins, 848 F.2d at 1213. There is a lot of evidence in this record that Plaintiff was unable to take medications due to inability to pay. R. 1157 (takes medications when she has the money for them and husband did not want to pay), 1118 (medications are too costly), 229 (could not take medications mainly for financial reasons), 916 (cannot take Prozac due to money issues), 595 (Plaintiff did not take a medication because the copay was too high), 999 (cannot afford antidepressants).

In summary, it was error for the ALJ to have failed to find that Plaintiff's mental impairments are not "severe" at step 2. The error was not harmless. At step 4 the ALJ did not independently examine the mental health evidence to determine to what extent

Plaintiff's residual functional capacity was eroded by her mental problems. Mental health evidence was discussed only as a subsidiary issue in determining Plaintiff's credibility and that was only directed at two subsidiary mental health issues, ability to concentrate and memory.  As a consequence, there was no direct consideration of the mental health evidence at step 4 in determining Plaintiff's residual functional capacity.

This error is especially important in this case.  The evidence indicates that for many years, physicians tried to find a physical cause for Plaintiff's symptoms, especially her experience of sudden weakness and falling.  A large number of medical tests found no objectively determined physical basis for her symptoms.  The fibromyalgia diagnosis was made early on, but even that diagnosis appears to have been left by the wayside in succeeding years.  Although there were earlier hints in the record, it was not until 2006 and 2007 that the examining physicians began to think that Plaintiff's problems were entirely psychological, that she suffers from conversion disorder.  If Plaintiff was disabled at all before the end of her insured period (December 31, 2003), it seems that it may have been due to mental impairments.

Moreover, the ALJ did not determine the minimum *mental* functional capacity needed to do Plaintiff's past relevant work.  This is important as there must be a fit between the determination of a claimant's functional abilities and the demands of the claimant's past relevant work before it can be said that a claimant can return to her past relevant work.  Plaintiff has tried to correct this deficit in the record by attaching evidence to show the functional capacity of those jobs, doc. 10, Exhibits A-C (doc. 10-2 through 10-4 on the electronic docket), but that evidence should be evaluated by an Administrative Law Judge and included in the administrative record.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and the case remanded so that the Administrative Law Judge may directly consider the mental health evidence and determine Plaintiff's residual functional capacity, and explicit findings regarding the actual physical and mental demands of Plaintiff's past work or other work in the national economy, and compare the actual demands of such work with Plaintiff's residual functional capacity.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** to directly consider the mental health evidence, determine Plaintiff's residual functional capacity after consider that evidence, make explicit findings regarding the actual physical and mental demands of Plaintiff's past work (step 4) or other work in the national economy (step 5, if needed), and compare the actual demands of such work with Plaintiff's residual functional capacity.

**IN CHAMBERS** at Tallahassee, Florida, on August 13, 2009.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.